[Cite as *In re A.S.*, 2025-Ohio-632.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: A.S.

C.A. No.     31099

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 22 04 0331

DECISION AND JOURNAL ENTRY

Dated: February 26, 2025

SUTTON, Judge.

{¶1}   Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed her minor child in the legal custody of his paternal grandmother ("Grandmother").  This Court affirms.

I.

{¶2}   Mother and Father are the biological parents of A.S., born September 16, 2021. Mother also has five older children who were in the temporary custody of Summit County Children Services Board ("CSB" or "the agency") at the time of A.S.' birth, after having been adjudicated abused and dependent.  Father is also the biological father of the youngest of those siblings.

{¶3}   The concerns underlying the removal of the five siblings included domestic violence by Father against Mother and the children, sexual abuse by Father against one or more of Mother's children, basic needs considerations, and Mother's mental health issues.  The juvenile court adopted CSB's case plan relating to the five older siblings.  Pursuant to that order, Mother

was required to demonstrate the ability to meet the children's basic needs, take initiative to obtain information regarding the children's services and medical care and attend appointments, engage in parenting education, participate in mental health services to address her past trauma and lack of judgment in light of her history of relationships involving intimate partner violence, obtain a drug and alcohol assessment and follow all recommendations, sign all necessary releases of information, exclude Father from her life, and fully cooperate with law enforcement relating to criminal matters involving Father.

{¶4} A.S. was born prematurely at 25 weeks' gestation and spent many weeks in the neonatal intensive care unit ("NICU"). During that time, Mother rarely and inconsistently visited the infant. She admitted to a CSB caseworker investigating the situation that she was continuing to have contact with Father. The agency filed a complaint alleging that A.S. was a dependent child based on unresolved issues underlying the siblings' cases, as well as concerns regarding Mother's ability to protect the infant, particularly in light of her minimizing Father's past abuse of her and her older children. CSB obtained emergency temporary custody of A.S. and placed him with a foster family upon his release from the NICU. Due to statutory time constraints, CSB dismissed and refiled its complaint. During the three months the original case was pending, Mother took advantage of her opportunity for weekly visitation with the infant in his foster home only once.

{¶5} When the child was eight months old, Mother moved to California. She appeared remotely for adjudication, waived her rights to a hearing, and stipulated to the child's dependency. Mother did not appear for the dispositional hearing. The juvenile court placed A.S. in CSB's temporary custody and adopted the agency's case plan. Mother's objectives in furtherance of reunification remained the same as those applicable to the siblings' cases. At the dispositional hearing, the CSB caseworker informed the juvenile court that Grandmother, who was living close

to Mother in California, had expressed an interest in placement early in the case and the agency had requested an Interstate Compact for the Placement of Children ("ICPC") assessment of her home.

{¶6} Evidence at the next two review hearings demonstrated that Mother was making minimal progress on her case plan objectives. In the meantime, Grandmother had completed all requirements to become a licensed foster care provider in California. Her ICPC assessment was in progress. A.S. was undergoing multiple assessments for suspected developmental delays. CSB amended the case plan to additionally require Mother to take advantage of all opportunities for visitation, keep a clean and well-maintained home, and obtain supplies for the child.

{¶7} In advance of the sunset hearing, Mother moved for legal custody, or alternatively, a first six-month extension of temporary custody. CSB also moved for an extension of its temporary custody. As California had by then approved Grandmother's ICPC assessment, CSB placed A.S. with her. Mother later waived her right to a sunset hearing and agreed to a first six-month extension of temporary custody as proposed by CSB. The juvenile court granted Mother supervised visitation in the community, with the option of removing the supervision requirement if Mother's visits consistently went well.

{¶8} CSB amended the case plan based on the child's placement with Grandmother and its development of a concurrent permanency plan. Mother's objectives remained unchanged. The agency emphasized that Mother's "[c]ontinued involvement with [Father] will be a barrier to reunification with [A.S.]"

{¶9} Prior to the expiration of the first six-month extension of temporary custody, CSB moved for legal custody to Grandmother. Mother filed alternative motions for legal custody or a second six-month extension of temporary custody. After a hearing, the magistrate granted the

agency's motion for legal custody to Grandmother. Mother filed timely objections, arguing that the evidence did not support the magistrate's award of legal custody to Grandmother and the denial of Mother's motion for a second extension of temporary custody. CSB filed a brief in opposition to Mother's objections.

{¶10} The juvenile court overruled Mother's objections, finding that CSB proved by a preponderance of the evidence that an award of legal custody to Grandmother was in the child's best interest. The trial court found that Mother failed to demonstrate by clear and convincing evidence that a second six-month extension of temporary custody was warranted. The juvenile court granted legal custody of A.S. to Grandmother and issued visitation orders for each parent. Mother timely appealed, raising two assignments of error. This Court consolidates the assignments of error to facilitate review.

II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR WHEN IT DENIED MOTHER'S MOTION FOR A SIX-MONTH EXTENSION AND UNREASONABLY REFUSED TO PROVIDE MOTHER WITH A REASONABLE REUNIFICATION TIME-FRAME.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR WHEN IT GRANTED LEGAL CUSTODY OF A.S. TO HIS PATERNAL GRANDMOTHER BECAUSE THE TRIAL COURT'S DECISION WAS NOT SUPPORTED BY A PREPONDERANCE OF THE EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶11} Mother argues that the juvenile court's judgment awarding legal custody of A.S. to Grandmother, and denying Mother's motion for a second six-month extension of temporary custody to CSB, is against the manifest weight of the evidence. This Court disagrees.

> On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest.

(Internal citations and quotations omitted.) *In re M.F.*, 2016-Ohio-2685, ¶ 7 (9th Dist.).

{¶12} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶13} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 2016-Ohio-1330, ¶ 12 (9th Dist.). The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 2016-Ohio-7994, ¶ 18 (9th Dist.), quoting *In re N.P.*, 2004-Ohio-110, ¶ 23 (9th Dist.). In that regard, the juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 2008-Ohio-5003, ¶ 9 (9th Dist.), citing *In re T.A.*, 2006-Ohio-4468, ¶ 17 (9th Dist.).

{¶14} The best interest factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see*

*also In re B.C.*, 2014-Ohio-2748, ¶ 16 (9th Dist.). In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 2017-Ohio-1, ¶ 17 (9th Dist.). While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶15} A.S. was just over two years old at the time of the legal custody hearing. CSB removed the child from Mother's custody upon the infant's release from the hospital, where he spent several months due to complications related to his premature birth. Despite the opportunity for liberal visits with A.S., Mother rarely spent time with the infant during his hospital stay and visited him only once while he resided in a foster home in Ohio, although not during the current case. A.S. spent his entire life in CSB's temporary custody, placed for 18 months in an Ohio foster home and the next nine months with Grandmother in California.

{¶16} Since his placement with Grandmother, A.S. has developed a strong bond with her and has acclimated well in her home. Mother testified that she had visited 15 times with the child over his two-year life, although the guardian ad litem testified that "15 visits is a stretch." The guardian ad litem reported that Mother is "essentially a stranger" to A.S., given her infrequent and sporadic contact with the child.

{¶17} As A.S. was only two years old and predominantly nonverbal, the guardian ad litem spoke on his behalf. She opined that an award of legal custody to Grandmother was in the child's best interest, based on the propriety of Grandmother's home and her responsiveness to the child's basic and special needs.

{¶18} A.S. has "very significant developmental delays[,]" as determined by a recent assessment. At two years old, his expressive communication skills were at a four-month-old level, his receptive communication skills were at a seven-month-old level, and his gross motor skills were at an 18-month-old level. He did not begin to walk until the age of 18 months. He experiences hand-eye coordination issues. The child attends two one-hour speech and occupational therapy sessions per week, alternating between Grandmother's home and a public library. A.S. will require therapeutic services for the foreseeable future. Grandmother is consistent in ensuring the child's participation in services.

{¶19} Despite the order requiring Mother to seek information regarding the child's special needs and attend his appointments, Mother failed to do so. She testified on the second day of the hearing that she had sought information about the child's medical care for the first time one day earlier. The guardian ad litem testified that Mother did not recognize the child's developmental delays as significant, instead asserting that "[h]e'll catch up." Mother's lack of both understanding and responsiveness to A.S.'s issues formed a major basis for the guardian's opinion that returning the child to Mother's legal custody would not be in his best interest.

{¶20} After spending his entire life in custodial limbo, A.S. requires permanency. Grandmother is willing and committed to providing a safe and stable lifelong home for the child. She was proactive in obtaining the child's assessments and she ensures his participation in ongoing therapeutic services. Grandmother is employed, has appropriate housing, and provides for all of the child's basic and special needs. She became a certified foster care provider for the sole purpose of demonstrating her ability to provide a safe and stable home for A.S. Grandmother testified that she is willing to provide a home for the child for the duration of his minority.

{¶21} The caseworker requested an ICPC assessment of Mother's home in California. Mother was not home during the time scheduled for the assessment, and the California agency informed CSB that it would be closing Mother's case. The caseworker was able to convince the California agency to give Mother a second chance. Although Mother had been living in that home for almost a year at the time of the assessment, she had no furniture except for an air mattress. She had no supplies of any kind for the child. Mother testified that she was only working part-time and was in the process of saving money to purchase household items. At the hearing, Mother showed pictures of her home which then contained a mattress for the child, a microwave, and a limited supply of food. She had no clothes, toys, or other supplies for the child, although she had been working full-time for a while at that time.

{¶22} Mother testified that she believed that the home assessor would tell her what she needed to obtain to provide an appropriate home for the child rather than expect her to already have necessary items. The guardian ad litem testified that it was not reasonable for Mother, who has five older children, to have failed to make any effort to furnish her home and procure basic, necessary supplies when Mother reported that she would do anything to achieve reunification.

{¶23} The guardian ad litem further expressed her concern that Mother had not gained any insight regarding the role of intimate partner violence in her life and the lives of her children. Mother remained in communication with Father even after she moved to California. Once there, she began a relationship with Father's uncle, although Mother reported that they were "just friends." This relationship concerned both Grandmother and the paternal great grandmother, given their familiarity with the uncle. When Father learned of the relationship, he began calling and threatening Mother. Only then did Mother seek a temporary protection order against Father. In

prior domestic violence cases, Mother admitted that she had advocated to drop the charges against Father.

{¶24} Mother did not complete her recommended course of therapy to address her role as a victim of domestic violence. The caseworker testified that she told Mother that the purpose of individual counseling was to enable her to make better choices by internalizing therapeutic lessons. Nevertheless, Mother ceased attending counseling because she believed she had made adequate progress even though her counselor did not support ending sessions.

{¶25} The caseworker testified that Mother made "some, maybe moderate" progress on her case plan objectives but "not significant" progress. While she was concerned that Mother had not successfully achieved her counseling goals and had not demonstrated a clear ability to provide for the child's basic and special needs, the caseworker remained particularly troubled by Mother's consistent lack of initiative and interest in being involved in the child's daily life. Mother did not seek updates regarding the child's delays, services, or general well-being. She rarely visited with A.S. and made little effort to coordinate visits, although she testified that Grandmother had done her part to facilitate visitation for her and the child. While Mother testified that she and A.S. "bond" during visits, Grandmother testified that she has never observed Mother's "parenting skills," rather only her "playing skills."

{¶26} Based on a thorough review of the record, this is not the exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice by awarding legal custody to Grandmother. A.S. is safe, stable, comfortable, and secure in Grandmother's home. Grandmother meets the child's basic needs and ensures that he receives necessary services to address his special needs. Grandmother facilitates visitation between Mother and A.S., even though Mother rarely takes advantage of those opportunities.

{¶27} On the other hand, Mother has not developed any insight into the child's medical and therapeutic needs or her own mental health issues, particularly as they relate to her role as a victim of domestic violence. Despite maintaining employment, Mother had not acquired the most basic necessities for the child except for a mattress. Both the caseworker and guardian ad litem emphasized that Mother continued to prioritize her relationship with romantic partners over establishing a relationship with her son. As a result, Mother remains a virtual stranger to A.S. Under these circumstances, the juvenile court's finding that an award of legal custody to Grandmother was in the child's best interest is not against the manifest weight of the evidence. Accordingly, Mother's second assignment of error is overruled.

{¶28} In consideration of Mother's argument that the juvenile court erred by failing to grant her motion for a six-month extension of temporary custody, this Court disagrees. As stated above, the juvenile court must resolve a motion for legal custody solely in consideration of the best interest of the child. *In re K.H.*, 2016-Ohio-1330, at ¶ 12. It is well settled that "'[w]here the trial court finds that it is in the best interest of the child to be placed in legal custody as a permanent disposition, the trial court must necessarily deny any extension of temporary custody.'" *In re B.C.*, 2014-Ohio-2748, at ¶ 22, quoting *In re C.M.*, 2009-Ohio-943, ¶ 24 (9th Dist.). *See also In re A.P.*, 2022-Ohio-276, ¶ 9 (9th Dist.) ("[I]f legal custody to a nonparent is in the best interest of the child, an extension of temporary custody is not.").

{¶29} In addition, the juvenile court would have had authority to grant a second six-month extension of temporary custody only if it also found, by clear and convincing evidence, that "there has been substantial additional progress since the original extension of temporary custody in the case plan of the child, . . . and there is reasonable cause to believe that the child will be reunified

with one of the parents . . . before the expiration of the additional extension period." R.C. 2151.415(D)(2).

{¶30} As explained above, Mother failed to make substantial additional progress on her case plan objectives. Moreover, there was not reasonable cause to believe that A.S. could have been reunified with Mother within the period of extension. Mother had stopped participating in mental health services and lacked insight regarding the impact of domestic violence in her life and the life of a child in her home. Her home did not contain necessary supplies for the child, even if he were to visit there. Throughout the child's two-year life, Mother visited with him at most 15 times by her own admission. She did not attend his medical or therapeutic appointments and only sought information about his providers the day before the final day of the hearing. Under these circumstances, Mother failed to present clear and convincing evidence that reunification was reasonably likely to occur within another six months. Mother's first assignment of error is overruled.

{¶31} For the above reasons, this Court concludes that the juvenile court did not err by denying Mother's motion for a second six-month extension of temporary custody and granting CSB's motion for legal custody to Grandmother. Accordingly, both of Mother's assignments of error are overruled.

III.

{¶32} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETTY SUTTON
FOR THE COURT

CARR, J.
CONCURS.

FLAGG LANZINGER, P. J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

ALEXANDRA HULL, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and MARRETT W. HANNA, Assistant Prosecuting Attorney, for Appellee.

LEONARD J. BREIDING II, Attorney at Law, for Appellee.

KANDEE ROBINSON-CHING, Guardian ad Litem.